

EXHIBIT
A-2

# ASSET PURCHASE AGREEMENT

**by and between**

**NORTH TEXAS TACO CASA, LLC,**

**as Purchaser**

**And**

**DIVINE DINING, LLC,**

**as Seller**

**August 23, 2018**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated August 23, 2018, is by and between North Texas Taco Casa, LLC, a Texas limited liability company ("Purchaser"), or its permitted designee, and Divine Dining, LLC, a Texas limited liability company, as debtor in possession in the below referenced Bankruptcy Case ("Seller" or the "Debtor").

## RECITALS

WHEREAS, Seller is in the business of operating a Taco Casa restaurant located at 1311 W. Airport Freeway, Irving, Dallas, County, Texas (as defined below, the "Restaurant");

WHEREAS, Purchaser desires to purchase certain Assets (as defined below) and assume the Assumed Liabilities (as defined below) of Debtor and the Estate, and Seller desires to sell the Assets to Purchaser pursuant to the terms and conditions of this Agreement, Bankruptcy Code Section 363, and the Sale Motion (as defined below) (the "Purchase");

WHEREAS, it is contemplated that on a date to be determined (the "Petition Date"), Seller (the "Debtor") will commenced a voluntary case (the "Bankruptcy Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court"); and

WHEREAS, it is further contemplated that the Debtor shall file a Motion for Order Pursuant to 11 U.S.C. §§ 105, 363, and 365 and Bankruptcy Rules 2002, 6004, 6006, and 9014 Approving: (A) Sale of Substantially All Assets of Debtor and Related Sale Procedures; (B) Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief (the "Sale Motion") approving the Purchase.

NOW, THEREFORE, in consideration of the foregoing and the respective covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby covenant and agree as follows:

1. **DEFINITIONS**

In addition to terms defined elsewhere in this Agreement, the following terms shall have the following meanings, unless the context otherwise indicates, both for purposes of this Agreement and all Schedules referenced herein:

1.1. "Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with the first Person. For the purposes of this definition, "control," when used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing. With respect to any natural Person, "Affiliate" will include such Person's parents, any descendants of such Person's parents, such Person's spouse, the parents of such Person's spouse, and any descendants of the parents of such Person's spouse (in each case, whether by blood, adoption, or marriage).

1

1.2. "<u>Ancillary Documents</u>" shall mean any certificate, exhibit, schedule, and all instruments or other documents furnished, executed or delivered pursuant to the express provisions of this Agreement.

1.3. "<u>Assignment and Assumption of Lease Agreement</u>" shall mean that certain Assignment and Assumption of Lease Agreement, dated as of the Closing Date prepared in form and substance satisfactory to the Debtor.

1.4. "<u>Bill of Sale and Assignment and Assumption Agreement</u>" shall mean that certain Bill of Sale and Assignment and Assumption Agreement, dated as of the Closing Date, by and between Purchaser and Seller, prepared in form and substance satisfactory to the Debtor.

1.5. "<u>Business</u>" shall mean the business of owning, operating and managing the Restaurant.

1.6. "<u>Business Day</u>" shall mean any day other than a Saturday, Sunday, or other day on which federally chartered commercial banks in Dallas, Texas are authorized by law to close.

1.7. "<u>Closing Date</u>" shall mean the date on which the Closing occurs.

1.8. "<u>Contemplated Transactions</u>" shall mean the transactions contemplated and described in this Agreement to occur at the Closing.

1.9. "<u>Damages</u>" shall mean all losses, claims, obligations, demands, assessments, penalties, liabilities, damages, and costs, including reasonable attorneys' fees and expenses.

1.10. "<u>Encumbrance</u>" shall mean any charge, claim, community property interest, condition, equitable interest, lien, encumbrance, option, pledge, security interest, mortgage, interest (including, without limitation, "interest" as such term is defined in Section 363(f) of the Bankruptcy Code), right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership, but excluding any restriction imposed by any lease to which an asset is subject.

1.11. "<u>GAAP</u>" means United States generally accepted accounting principles consistently applied.

1.12. "<u>Governing Documents</u>" means in the case of a partnership, the limited partnership agreement and the certificate of limited partnership and in the case of a limited liability company, the limited liability company agreement and the certificate of formation.

1.13. "<u>Governmental Body</u>" shall mean any federal, state, local, or municipal government or governmental authority of any nature (including any governmental agency, branch, department, official or entity, and any court or other tribunal).

1.14. "<u>Knowledge</u>" shall mean the current actual knowledge of a natural person or, for an entity, the current actual knowledge of the officers and directors and Persons performing similar functions for such entity.

2

1.15. "Law" or "Laws" shall mean any and all statutes, laws, ordinances, regulations, published requirements, orders, decrees, and rules of any Governmental Body, other than any franchise Law of any jurisdiction.

1.16. "Legal Requirement" means any federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty.

1.17. "Material Adverse Change" means a material adverse change which has occurred or could reasonably be expected to occur (whether or not such change arises from any fact, circumstance, result, change, event, violation or occurrence that (i) was foreseeable or known as of the date of this Agreement or the Closing Date or (ii) covered by insurance) to the Business, the ability of Seller to consummate the Contemplated.

1.18. "Ordinary Course of Business" shall mean an action taken by a Person that is consistent with the past practices of such Person, both as to type and amount, and is typically taken in the ordinary course of the normal operations of such Person.

1.19. "Parties" shall mean the parties to this Agreement, and "Party" shall mean any Person that is a party to this Agreement.

1.20. "Person" shall mean a corporation, an association, a partnership, a limited liability company or other entity, an individual, or a government (or political subdivision thereof) or a Governmental Body.

1.21. "Petition Date" shall have the same meaning as used to such term in the recitals.

1.22. "Proceeding" shall mean any action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

1.23. "Receiver" shall mean Elizabeth C. Brandon, as Receiver appointed pursuant to that Agreed Order Appointing Receiver (the "Receivership Order") dated April 9, 2018 entered in *Mantas v. Johnson, et al.*, Cause No. DC-18-03705, and *Johnson v. Divine Dining et al.*, Cause No. DC-18-04074 (collectively, the "Receivership Case"), in the 116th Judicial District Court, Dallas County, Texas (the "Receivership Court").

1.24. "Restaurant" shall mean the Taco Casa restaurant located at 1311 West Airport Freeway, Irving, Dallas County, Texas.

1.25. "Tax" and "Taxes" shall mean any federal, state, or local or other tax, assessment, or charge of any nature whatsoever, together with any penalties, additions to tax, fines, and interest thereon or related thereto.

2.     **SALE AND PURCHASE**

2.1.   Purchase and Sale of Assets

(a)     *Assets to be Purchased.*  Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Purchaser shall purchase from Seller, and Seller shall sell, assign, transfer, convey, and deliver to Purchaser, free and clear of any Encumbrance, all of Seller's right, title, and interest in and to:

(i)     all of the assets that are used in connection with the Business and that are associated with the Business, including without limitation all kitchen equipment, furniture, fixtures, operating supplies and food and beverage inventory (collectively, the "Personal Property");

(ii)     all right, title, and interest of Seller in, to, and under the following contracts (collectively, the "Assumed Contracts");

(1)     *Restaurant Lease.*  The Commercial Lease dated effective November 30, 2011 by and between Seller and Adelphi Group Ltd. ("Landlord") related to the real property associated with the Restaurant, as amended by (a) the Commercial Lease Addendum dated November 30, 2011 by and between the Seller and Landlord; and (b) the Lease Addendum dated April 17, 2012 by and between the Seller and Landlord (as amended, the "Restaurant Lease"); and as may subsequently be amended according to the conditions precedent set forth in Section 6 below; and

(2)     *Franchise Agreement.*  The Taco Casa Franchise Agreement (the "Franchise Agreement") dated October 4, 2011 with Roy Upshaw, individually d/b/a Taco Casa ("Franchisor"); and as may subsequently be amended according to the conditions precedent set forth in Section 6 below;

(iii)     to the extent assignable or transferable by law or their terms, all manufacturer's, merchant's, repairmen's, vendor's, and other third-party warranties, guaranties, and service or replacement programs relating to the Personal Property (the "Warranties");

(iv)     all customer lists, sales records, customer payment histories, quality or warranty claims, and related commercial information or documents related to the Business (the "Customer Information"); and

(v)     all permits or licenses necessary to operate the Business to the extent transferable (the "Permits").

The Personal Property, the Assumed Contracts, the Warranties, the Customer Information and the Permits are collectively referred to in this Agreement as the "Assets."

4

(b)     *Assignment and Assumption of Contracts.*  Seller shall assign all of its right, title, and interest in and to, Purchaser, and Purchaser shall assume, and timely perform and discharge, all of Seller's obligations under the Assumed Contracts from and after the Closing Date.

(c)     *Excluded Assets.*  Seller shall, and hereby does, expressly retain all of Seller's right, title and interest in and to the assets, properties, rights, and interests of Seller that follow (collectively, the "Excluded Assets"):

(i)     cash;

(ii)    accounts receivable;

(i)     actions under Chapter 5 of the Bankruptcy Code including, without limitation, all causes of action (whether derivative or otherwise) held by the Debtor as of the Petition Date;

(iii)   any and all executory contracts or leases not expressly assumed or assigned in this Agreement.

(d)     *Assumed Liabilities.*  All Assets shall be sold free and clear of all liens, claims, Encumbrances, and interests of any party.  Purchaser agrees to assume the following liabilities:

(i)     All rents due under the Restaurant Lease accruing from and after the Closing Date; and

(ii)    All obligations due under the Franchise Agreement accruing from and after the Closing Date;

(iii)   All prepetition and postpetition obligations to the food vendors Bassham Foods and Cardona Food Inc.;

(iv)    All unpaid payroll and sales tax liabilities existing at the Closing Date.

(e)     *Consents.*  To the extent that the conveyance or assignment of any Asset or the assumption and assignment of any Assumed Contract requires that notice be given to or that a consent, approval, or waiver be obtained from any third party, any Governmental Body, or the Bankruptcy Court (a "Consent"), Seller, at Seller's expense, shall use its commercially reasonable best efforts to give such notice or obtain such Consent before the Closing Date or as soon after the Closing Date as is reasonably possible.

(f)     *Cure Obligations.*  Purchaser shall pay any cure obligations owed under the Restaurant Lease and Franchise Agreement at Closing.

5

2.2.   Purchase Price.

(a)   *Payment*. As full payment for the Assets, on or before the Closing Date Purchaser shall pay the total of (1) an amount as may be necessary to cure all defaults under the Restaurant Lease and the Franchise Agreement; plus (2) $50,000 (collectively, the "Purchase Price") to Seller by:

(i)   Contemporaneously with the execution hereof, and as a condition precedent to Seller's obligations under this Agreement, Purchaser shall deposit the sum of $25,000 (the "Earnest Money") by wire transfer of immediately available funds into an account designated by the Seller (or other form of payment acceptable to Seller), which shall be refunded to Purchaser only in the event of a sale of substantially all of the assets, and assignment of the executory contracts and unexpired leases of the Seller to a party other than Purchaser for an amount in excess of the Purchase Price. It is specifically contemplated and agreed that the Earnest Money may be immediately utilized to fund expenses in the Receivership Case and Bankruptcy Case; and

(ii)   At Closing, the sum of $25,000 by wire transfer of immediately available funds into an account designated by Seller (or other form of payment acceptable to Seller).

(b)   *Purchase Price Allocation*. The Purchase Price shall be allocated among the Acquired Assets as agreed by the parties at Closing. Such allocation shall be used by the Parties for all tax purposes and filings, including IRS Form 8594 and similar forms that may be promulgated in the future.

2.3.   Employees. Purchaser shall hire a sufficient number of Debtor's employees on the Closing Date to avoid any liability under the United States Worker Adjustment and Retraining Notification Act, as amended ("WARN") and of any equivalent law of the State of Texas. Any of Debtor's employees that are employed by Purchaser shall be employed by Purchaser solely in accordance with Purchaser's hiring and other employment policies and procedures, which may differ from Debtor's employment policies and procedures.

(b)   The Closing. Unless otherwise agreed to by Purchaser and Seller in writing, the closing of the Contemplated Transactions (the "Closing"), shall take place at the offices of Receiver on the date that is two (2) Business Days after the satisfaction of all conditions precedent to Purchaser's obligations as set forth in Article 6.

2.4.   Closing Deliveries

(a)   At the Closing, subject to the terms and conditions hereof, each of the Parties (as applicable) shall execute and/or deliver the following items, documents, agreements and instruments:

(i)   Purchase Price, subject to any adjustment for prorations and other credits provided for herein and net of any pre-Petition cure obligations owed under the Restaurant Lease and Franchise Agreement;

6

(ii)     the Bill of Sale and Assignment and Assumption Agreement;

(iii)    for the Restaurant Lease, an Assignment and Assumption of Lease in the form set forth as prepared in form and substance satisfactory to the Debtor;

(iv)    for the Franchise Agreement, an Assignment and Assumption of Franchise Agreement in the form set forth as prepared in form and substance satisfactory to the Debtor;

(v)     any Consents required under Section 2.1(e) or 3.4;

(vi)    Closing certificates executed by each of the parties certifying the accuracy of its representations and warranties as of the date of this Agreement and as of the Closing Date and as to their compliance with and performance of their covenants and obligations to be performed or complied with at or before the Closing; and

(vii)   Seller shall deliver a release and termination agreement in form and substance acceptable to Purchaser releasing, waiving and terminating all rights and interest that Seller, the Debtor, and the Estate may have under the IP License Agreement;

(b)     All ad valorem taxes levied on or charged to the Assets for the year of the Closing and any rents for the month of the Closing shall be prorated as of the Closing Date between Seller and Purchaser, and the Purchase Price will be adjusted up or down as necessary.

## 3.     REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER

As an inducement to Purchaser to enter into this Agreement, Seller represents and warrants to Purchaser as follows:

3.1.    Existence and Good Standing. Seller is a limited partnership duly organized, and validly existing and in good standing under the laws of the State of Texas.

3.2.    Power and Authority; Authorization. Subject only to approval of this Agreement and the Contemplated Transactions by the Bankruptcy Court, Seller has the absolute and requisite right, power, and authority to execute and deliver this Agreement, the Ancillary Documents and each of the other agreements and instruments contemplated hereby to which it is or is to be a party, and no further action on the part of Seller is necessary to fully authorize such execution, delivery, and performance and to carry out its obligations hereunder.    This Agreement, the Ancillary Documents, and each of the other agreements and instruments contemplated hereby to which Seller is a party, have been, or when executed will be, duly executed and delivered by it and are or will be the legal, valid, and binding obligations of such party, enforceable against it in accordance with the terms hereof and thereof, except as may be (a) limited by any applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting the enforcement of creditors' rights generally and (b) subject to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

3.3.    No Conflict with Other Instruments. The execution and delivery by Seller of this Agreement, the Ancillary Documents, and each of the other agreements and instruments

7

contemplated hereby to which Seller is a party, and the consummation of the Contemplated Transactions will not (a) to the Knowledge of Seller, violate any provision of any Law to which Debtor or any of its Affiliates are subject; or (b) result in the imposition or creation of any Encumbrance upon or with respect to any of the Assets.

3.4.   <u>Consents and Approvals</u>.   Subject only to the approval of this Agreement and the Contemplated Transactions by the Bankruptcy Court, no Consent, authorization, approval, or other consent, permit or license of, or filing with, any Governmental Body, any lender or lessor or any other Person is required to be made or obtained by or with respect to Seller in connection with the execution, delivery and performance of this Agreement, including consummation of the Contemplated Transaction and assumption of the Assumed Contracts, or any of the Ancillary Documents on the part of Seller.

3.5.   <u>Title to Assets</u>.   As of the Closing Date, Seller will have conveyed to Purchaser, and Purchaser will own, all of the interest of Seller, Debtor, and the Estate in the assets of the estate used or useful in the conduct of, the Business as conducted by Debtor and/or Seller immediately before the Closing Date.

3.6.   <u>No Undisclosed Liabilities</u>.   Neither Seller nor any of its Affiliates has incurred any obligation, liability or commitment (absolute, accrued, contingent or otherwise) on behalf of Debtor that is not fully reflected on the bankruptcy schedules filed with the Court, incurred in the Ordinary Course of Business, pursuant to the Assumed Contracts, or reflected on the books and records of Debtor.

4.   **REPRESENTATIONS AND WARRANTIES OF PURCHASER**

As an inducement to Seller to enter into this Agreement, Purchaser represents and warrants to Seller as follows:

4.1.   <u>Organization</u>.   Purchaser is a limited liability company duly formed and validly existing under the laws of the State of Texas.

4.2.   <u>Power and Authority; Authorization</u>.   Subject only to approval of this Agreement and the Contemplated Transactions by the Bankruptcy Court, Purchaser has the absolute and requisite power and legal capacity to execute, deliver, and perform this Agreement, the Ancillary Documents and each of the other agreements and instruments contemplated hereby to which it is a party.   This Agreement, the Ancillary Documents, and each of the other agreements and instruments contemplated hereby to which Purchaser is a party, have been, or when executed will be, duly executed and delivered by it and are or will be the legal, valid, and binding obligations of Purchaser, enforceable against it in accordance with the terms hereof and thereof, except as may be (a) limited by any applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting the enforcement of creditors' rights generally and (b) subject to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at Law).

4.3.   <u>No Conflict with Other Instruments</u>.   The execution and delivery by Purchaser of this Agreement, the Ancillary Documents, and each of the other agreements and instruments contemplated hereby to which Purchaser is a party, and the consummation of the Contemplated

Transactions will not (a) result in a breach or violation of, or constitute a default under, any indenture, mortgage, note, lease, loan agreement, or other agreement or instrument to which Purchaser is a party or by which it or any of its properties is bound or subject; (b) to the Knowledge of Purchaser, violate any provision of any Law to which Purchaser or any of its Affiliates are subject; or (c) contravene, conflict with or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate or modify, any agreement.

4.4. <u>Consents and Approvals</u>. Subject only to approval of this Agreement and the Contemplated Transactions by the Bankruptcy Court, no authorization, consent, approval, permit or license of, or filing with, any Governmental Body, any lender or lessor or any other Person is required to be made or obtained by or with respect to Purchaser in connection with the execution, delivery, and performance of this Agreement or any of the Ancillary Documents by Purchaser.

5. **ADDITIONAL COVENANTS**

5.1. [Reserved.]

5.2. <u>Cooperation and Access</u>. Between the date of this Agreement and the Closing, Seller shall afford the authorized representatives and agents of Purchaser reasonable access to and the right to inspect the Assets and the books and records of Seller and Debtor relating to the Assets, and will furnish Purchaser with such additional data and other information relating to the Assets as Purchaser may from time to time reasonably request, subject to Purchaser signing a mutually acceptable non-disclosure agreement.

5.3. <u>Operation of Business</u>. Between the date of this Agreement and the Closing, Seller shall (i) conduct and operate the Business only in the Ordinary Course of Business; (ii) except as otherwise directed by Purchaser in writing, and without making any commitment on Purchaser's behalf, use its reasonable best efforts to preserve intact the Debtor's current business organization, keep available the services of key employees and make maintain its relations and good will with customers; (iii) confer with Purchaser prior to implementing operational decisions of a material nature; (iv) report periodically to Purchaser concerning the status of the Business operations and finances; (v) make no material changes in management personnel or key employees without prior consultation with Purchaser; (vi) maintain the Assets in a state of repair and condition that complies with Legal Requirements and is consistent with the requirements and normal conduct of Business; (vii) upon request from time to time, execute and deliver all documents, make all truthful oaths, testify in any Proceedings and do all other acts that may be reasonably necessary or desirable in the opinion of Purchaser to consummate the Contemplated Transactions, all without further consideration; and (viii) maintain all books and records relating to the Business in the Ordinary Course of Business.

5.4. <u>Negative Covenant</u>. Except as otherwise expressly permitted herein, between the date of this Agreement and the Closing Date, Seller shall not, without written consent of Purchaser, (a) take any affirmative action or fail to take any reasonable action within its control, which would lead to a material adverse change in the Business whether or not performed within the Ordinary Course of Business; (b) make any modification to any material Contract or Governmental Authorization; (c) allow the levels of food and beverage inventory necessary for the operation of the Business to vary materially from the levels customarily maintained; or (d)

enter into any compromise or settlement of any litigation, proceeding or governmental investigation relating to the Assets, the Business or the Assumed Liabilities.

5.5. Required Approvals. As promptly as practicable following the date of this Agreement, Seller shall make all filings under the Legal Requirements that it is required to make to consummate the Contemplated Transactions. Seller shall also cooperate with Purchaser with respect to all filings that Purchaser elects to make or is required to make pursuant to the Legal Requirements. Seller shall also cooperate with Purchaser in obtaining all Material Consents.

5.6. Notification. Between the date of this Agreement and the Closing, Seller shall promptly notify Purchaser in writing if it becomes aware of (a) any fact or condition that causes or constitutes a breach of any of Seller's representations and warranties made as of the date of this Agreement or (b) the occurrence after the date of this Agreement of any fact or condition that would or be reasonably likely to (except as expressly contemplated by this Agreement) cause or constitute a breach of any such representation or warranty had that representation or warranty been made as of the time of the occurrence of, or Seller's discovery of, such fact or condition. During the same period, Seller also shall promptly notify Buyer of the occurrence of any breach of any covenant of Seller in this Article 5 or of the occurrence of any event that may make the satisfaction of the conditions in Article 7 impossible or unlikely.

6.    **CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATIONS TO CLOSE**

Purchaser's obligation to purchase the Assets and to take the other actions required to be taken by Purchaser at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Purchaser in whole or in part):

6.1.    Accuracy of Representations. All of Seller's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), shall have been accurate in all material respects as of the date of this Agreement, and shall be accurate in all material respects as of the time of the Closing.

6.2.    Seller's Performance. All of the covenants and obligations that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), shall have been duly performed and complied with in all material respects.

6.3.    No Conflict. Neither the consummation nor the performance of any of the contemplated transactions will, directly or indirectly (with or without notice or lapse of time), contravene or conflict with or result in a violation of or cause Purchaser or any Affiliate of Purchaser to suffer any adverse consequence under (a) any applicable Legal Requirement or Order or (b) any Legal Requirement or Order that has been published, introduced or otherwise proposed by or before any Governmental Body, excluding Bulk Sales Laws.

6.4.    Bankruptcy Court Order. The Bankruptcy Court shall have entered an order, in form and substance acceptable to Purchaser, approving this Agreement and the Contemplated Transactions in their entirety (the "Sale Order"), such Sale Order shall have been entered on the docket of the Bankruptcy Court and such Sale Order, unless waived in writing by Purchaser, shall have become a Final Order. As used in this Agreement, the term "Final Order" shall mean any order of the Bankruptcy Court as to which (i) there is no stay or other limitation on the terms

10

or effectiveness, (ii) no appeal is pending, and (iii) the time to file an appeal has expired. The Sale Order shall not be submitted to the Bankruptcy Court prior to approval as to the form and substance of the Sale Order by Purchaser.

6.5. _Bankruptcy Sale Motion_. Seller shall have filed or otherwise pursued a motion (and related notices and proposed orders) with the Bankruptcy Court seeking entry of the Sale Order and any ancillary or related orders reasonably necessary or advisable to effect the provisions of this Agreement and the Contemplated Transactions. Seller shall use commercially reasonable efforts to prosecute such motion or motions and to ensure that the Sale Order is entered and approved, and to request that the Sale Order provides that it shall become effective immediately and that the provisions of Federal Rules of Bankruptcy Procedure 6004(g) shall be waived for cause.

6.6. _No Material Adverse Change_. There being no Material Adverse Change in the Business between the date of this Agreement and the Closing Date.

## 7.    CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS TO CLOSE

7.1. _Bankruptcy Court Order_. The Sale Order in form and substance acceptable to Seller shall have become a Final Order.

7.2. _Accuracy of Representation_. All of Purchaser's representations and warranties in this Agreement, considered collectively and individually, shall have been accurate in all material respects as of the signing of this Agreements and shall be accurate in all material respects as of the Closing Date as if then made.

7.3. _Purchaser's Performance_. All of the covenants and obligations that Purchaser is required to perform or to comply with pursuant to this Agreement at of prior to the Closing Date, considered both collectively and individually, shall have been performed and complied with in all material respects.

7.4. _Consents and Approvals_. All Consents necessary for Purchaser to assume the Assumed Contracts shall have been obtained.

## 8.    TERMINATION

8.1. _Termination Events_. By notice given prior to or at the Closing, subject to Section 8.2, this Agreement may be terminated as follows:

(a)    by Purchaser if a material breach of any provision of this Agreement has been committed by Seller and such breach has not been waived by Purchaser;

(b)    by Seller if a material breach of any provision of this Agreement has been committed by Purchaser and such breach has not been waived by Seller;

(c)    by Purchaser if any condition in Article 6 has not been satisfied as of the Closing Date or if satisfaction of such a condition by such date is or becomes impossible (other than through the failure of Purchaser to comply with its obligations under this Agreement), and Purchaser has not waived such condition on or before such date;

(d)    by Seller if any condition in Article 7 has not been satisfied as of the Closing Date or if satisfaction of such a condition by such date is or becomes impossible (other than through the failure of Seller to comply with their obligations under this Agreement), and Seller has not waived such condition on or before such date;

(e)    by mutual consent of Purchaser and Seller;

(f)    by Purchaser if the Closing has not occurred on or before **[forty-five (45)]** days after the signing of this Agreement, or such later date as the parties may agree upon, unless Purchaser is in material breach of this Agreement; or

(g)    by Purchaser or Seller, upon written notice to the other, if the Bankruptcy Court enters an order authorizing and approving an alternate sale or disposition of any of the Assets to any Person other than Purchaser (an "Alternative Transaction").

8.2.    Effect of Termination.  In the event of the termination of this Agreement by either Purchaser or Seller as provided in Section 8.1 of this Agreement, this Agreement shall forthwith become void and there shall be no liability or obligation hereunder on the part of Purchaser or Seller; provided, however, if this Agreement is terminated pursuant to Section 8.1(g), Seller shall pay Purchaser the Earnest Money.  The Earnest Money Refund shall be paid at the closing of an Alternative Transaction.  The Parties agree and acknowledge that the Earnest Money Refund shall be allowed and paid as an administrative expense claim of Purchaser after the closing of the Alternative Transaction under Section 503(b)(1) of the Bankruptcy Code in consideration of Purchaser's due diligence, good faith negotiations of and entering into this Agreement, and in recognition of Purchaser's work in:  (i) establishing a bid standard; (ii) placing Estate property in a position of attracting other potential bidders; and (iii) serving by its expressed interest, as a catalyst for other potential bidders.

9.    **MISCELLANEOUS**

9.1.    Notices.  Unless otherwise set forth hereunder, all notices permitted or required to be delivered pursuant to the provisions of this Agreement shall be in writing.  All notices permitted or required to be delivered pursuant to the provisions of this Agreement shall be deemed so delivered upon receipt (or refusal of receipt) (a) if personally delivered against written receipt, (b) if sent by facsimile (with confirmation of transmission) to the facsimile number set forth below or (c) if sent with a nationally recognized overnight courier service, prepaid, and addressed to the Party as follows:

If to Seller, to:

> Elizabeth C. Brandon, Receiver
> Barnes & Thornburg LLP
> 2100 McKinney Avenue, Suite 1250, Dallas, TX 75201-6908
> Direct: (214) 258-4115
> Notice shall include notice via email to jwelton@btlaw.com and ebrandon@bttlaw.com

With copy to:

    Richard G. Grant
    CULHANE MEADOWS, PLLC
    100 Crescent Court, Suite 700
    Dallas, Texas 75201
    214-210-2929
    Notice shall include notice via email to rgrant@culhanemeadows.com

If to Purchaser, to:

    Sami N. Ebrahim
    Forest Central II
    11551 Forest Central Dr., Suite 230
    Dallas, TX 75243
    214-319-9100 (t)
    214-319-9102 (f)
    sami@dfwoilenergy.com

or to such other address and to the attention of such other person(s) as Purchaser or Seller, as applicable, may designate by written notice. Any notice mailed shall be deemed to have been given and received on the third Business Day following the day of mailing.

9.2. <u>Assignment</u>. No Party to this Agreement may sell, transfer, assign, pledge, or hypothecate its rights, interests or obligations under this Agreement without the consent of the other Parties.

9.3. <u>Successors</u>. This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Parties and their respective successors, personal representatives, heirs, and permitted assigns.

9.4. <u>Entire Agreement</u>. This Agreement and the Ancillary Documents constitute the entire agreement and understanding between the Parties relating to the subject matter hereof and thereof and supersede all prior representations, endorsements, premises, agreements, memoranda, communications, negotiations, discussions, understandings, and arrangements, whether oral, written or inferred, between the Parties relating to the subject matter hereof.

9.5. <u>Further Acts</u>. Each Party shall, from time to time after the Closing Date, at the request of any other Party and at such requesting Party's expense, (a) execute and deliver or cause to be executed and delivered such further instruments and shall take or cause to be taken such other action as reasonably requested, as may be necessary to effectively vest title to the Assets in Purchaser and to implement and carry into effect the Contemplated Transactions and (b) use commercially reasonable efforts to obtain consents with respect to any agreement assigned to Purchaser for which a consent by a third party was required.

9.6. <u>Governing Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ALL RESPECTS IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO THE CONFLICTS OF LAWS

PRINCIPLES THEREOF. EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN DALLAS COUNTY, TEXAS, FOR THE PURPOSES OF ANY ACTION ARISING OUT OF THIS AGREEMENT OR ITS SUBJECT MATTER, BROUGHT BY ANY OTHER PARTY.

9.7. <u>Modification, Amendment and Waiver</u>. This Agreement may not be modified unless such modification is in writing and signed by the Parties. No waiver of any term of this Agreement shall be enforceable unless in writing and signed by the Party against which it is sought to be enforced. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by such other Party.

9.8. <u>Severability</u>. Any provision hereof that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability shall not render such provision prohibited or unenforceable in any other jurisdiction.

9.9. <u>No Third Party Beneficiaries</u>. Any agreement contained, expressed, or implied in this Agreement shall be only for the benefit of the Parties and their respective legal representatives, successors, heirs, and permitted assigns, it being the intention of the Parties that no Person shall be deemed a third party beneficiary of this Agreement, except to the extent a third party is expressly given rights herein.

9.10. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.11. <u>Headings</u>. The headings of the Articles, Sections, and Subsections of this Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions hereof or affect in any way the meaning or interpretation of this Agreement.

9.12. <u>Expenses and Taxes</u>. Each Party will be responsible for paying its own fees, costs, and expenses in connection with negotiating and performing due diligence and transactions set forth in this Agreement. All ad valorem and other taxes (all such taxes, real and personal, collectively, "<u>Taxes</u>") levied on or charged against the Assets in the year of the Closing Date shall be prorated between Seller and Purchaser. Seller shall be responsible for its pro rata share of the Taxes from the Petition Date up to the Closing Date and Purchaser shall be responsible for all taxes accrued after and including the Closing Date.

**[Remainder of page intentionally left blank.]**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first above written.

PURCHASER:

North Texas Taco Casa, LLC

By: _____

Name: ___Sami N Ebrahim_____

Title: ___Managing Partner_____

Date Signed: ___August 23, 2018_____

SELLER:

DIVINE DINING, LLC,
a Texas Limited Liability Company

By: _____
    Elizabeth C. Brandon, as Receiver

15

# AMENDMENT TO ASSET PURCHASE AGREEMENT

### by and between

## NORTH TEXAS TACO CASA, LLC,

### as Purchaser

### And

## DIVINE DINING, LLC,

### as Seller

### November 1st 2018

1

## AMENDMENT TO ASSET PURCHASE AGREEMENT

This Amendment ("Amendment") dated November 1st, 2018, is by and between North Texas Taco Casa, LLC, a Texas limited liability company ("Purchaser"), or its permitted designee, and Jason Rae, the duly appointed Chapter 11 Trustee ("Trustee") for the bankruptcy estate of Divine Dining, LLC, a Texas limited liability company ("Seller").

## RECITALS

WHEREAS on or about August 23, 2018, Purchaser entered into that certain Asset Purchase Agreement ("Agreement") with Divine Dining, LLC, a Texas limited liability company ("Debtor");

WHEREAS pursuant to the Agreement, Purchaser agreed to purchase the Assets[1] and assume the Assumed Liabilities of Debtor and the Estate and Debtor agreed to sell the Assets to Purchaser pursuant to Bankruptcy Code Section 363;

WHEREAS Debtor filed a voluntary petition on August 27, 2018 under Chapter 11 of the Bankruptcy Code thereby initiating case no. 18-32805-SGJ-11 ("Bankruptcy Case") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division ("Bankruptcy Court");

WHEREAS pursuant to the Unopposed Order Directing the Appointment of a Chapter 11 Trustee entered by the Bankruptcy Court on August 31, 2018 ("Trustee Order"), the United States Trustee appointed Jason Rae as the Trustee in the Bankruptcy Case;

WHEREAS the Trustee is now the designated representative of the Debtor's Estate with the authority to operate the Debtor's business, manage the Estate's assets and affairs and complete the sale of the Assets as set forth in the Agreement on behalf of the Seller; and

WHEREAS the Trustee and Purchaser have now agreed to proceed with the sale of the Assets pursuant to the terms of the Agreement as modified by this Amendment.

NOW, THEREFORE, in consideration of the foregoing and the respective covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby covenant and agree as follows:

A. Ratification of Agreement.  The Seller, by and through the Trustee, and the Purchaser by its Managing Partner, hereby ratify and confirm the terms and provisions of sale as set forth in the Agreement subject to the Bankruptcy Court's approval of the sale pursuant to Sections 363 and 365 of the Bankruptcy Code, and the terms and provisions of the Agreement are hereby incorporated herein by reference for all purposes subject only to the specific amendments to the following provisions and terms in the Agreement as set forth hereinbelow which shall be deemed to amend and replace the original numbered provisions of the Agreement:

B. Except as to the definition in 1.23, the term "Receiver" shall be replaced throughout by "Trustee."

---

[1] Unless otherwise defined herein, all capitalized terms shall have the same meaning ascribed to them in the Agreement, which is incorporated herein for all purposes.

2

2.1   <u>Purchase and Sale of Assets</u>

(c) *Excluded Assets.* Seller shall, and hereby does, expressly retain all of Seller's right, title and interest in and to the assets, properties, rights, and interests of Seller that follow (collectively, the "Excluded Assets"):

      (i)     all cash on hand in the Debtor's possession and accounts as of the date of Closing

      (ii)    accounts receivable as of the date of Closing only to the extent such accounts are comprised of merchant credit card receipts necessary to cover the amount of accrued and unpaid expenses for the business operations and the costs of administration for the Bankruptcy Case as of the Closing Date (the "Operating Shortfall");

      (iii)   all claims and causes of action arising under Chapter 5 of the Bankruptcy Code, including, without limitation, all causes of action (whether derivative or otherwise) held by the Debtor as of the Petition Date; and

      (iv)   any and all executory contracts or leases not expressly assumed or assigned in this Agreement or rejected as of the date of Closing.

(d)    *Assumed Liabilities.* All Assets shall be sold free and clear of all liens, claims, Encumbrances, and interest of any party. Purchaser agrees to assume the following liabilities:

      (i)     all obligations under the Restaurant Lease arising from and after the Closing Date and any cure claim under the Restaurant Lease to the extent allowed by the Bankruptcy Court or agreed to between Purchaser and landlord;

      (ii)    all obligations under the Franchise Agreement arising from and after the Closing Date and any cure claim under the Franchise Agreement to the extent allowed by the Bankruptcy Court or agreed to between Purchaser and franchisor;

      (iii)   (not amended)

      (iv)   (not amended)

(e)    *Consents.* To the extent that the conveyance or assignment of any Asset or the assumption and assignment of any Assumed Contract requires that notice be given to or that a consent, approval, or waiver be obtained from any third party, any Governmental Body, or the Bankruptcy Court, and such requirement is enforceable under the Bankruptcy Code by the counterparty to the contract, consent or waiver (a "Consent"), Seller, at Seller's expense, shall use its commercially reasonable best efforts to give such notice or obtain such Consent before the Closing Date or as soon after the Closing Date as is reasonably possible

2.2 Purchase Price.

(a)    Payment. As full payment for the Assets, on or before the Closing Date Purchaser shall pay the total of (1) an amount as may be necessary to cure all defaults under the Restaurant Lease and the Franchise Agreement; plus (2) the Operating Shortfall; plus (3) $50,000 (collectively, the "Purchase Price") to Seller by:

      (i) not amended

(ii) At Closing, the sum of $25,000 plus the Operating Shortfall by wire transfer of immediately available funds into an account designated by Seller (or other form of payment acceptable to Seller).

2.4 Closing Deliveries

(a)      At the Closing, subject to the terms and conditions hereof, each of the Parties (as applicable) shall execute and/or deliver the following items, documents, agreements and instruments:

(i)      Purchase Price, subject to any adjustment for prorations and other credits provided for herein, plus any pre-petition cure obligations owed under the Restaurant Lease and Franchise Agreement;

(ii) – (vi) not amended

(vii) omitted

(b)      All ad valorem taxes levied on or charged to the Assets for the year of the Closing shall be prorated as of the Closing Date between Seller and Purchaser, and the Purchase Price will be adjusted up or down as necessary.

5.3      Operation of Business.  Between the date of this Agreement and the Closing, Seller shall (i) conduct and operate the Business only in the Ordinary Course of Business; (ii) use its reasonable best efforts to preserve intact the Debtor's current business organization, keep available the services of key employees and make maintain its relations and good will with customers; (iii) confer with Purchaser prior to implementing operational decisions of a material nature; (iv) report periodically to Purchaser concerning the status of the Business operations and finances; (v) make no material changes in management personnel or key employees without prior consultation with Purchaser; (vi) maintain the Assets in a state of repair and condition that complies with Legal Requirements and is consistent with the requirements and normal conduct of Business; (vii) upon request from time to time, execute and deliver all documents, make all truthful oaths, testify in any Proceedings and do all other acts that may be reasonably necessary or desirable in the opinion of Purchaser to consummate the Contemplated Transactions, all without further consideration; and (viii) maintain all books and records relating to the Business in the Ordinary Course of Business.

6.5      Bankruptcy Sale Motions.  Seller shall have filed or otherwise pursued motions (and related notices and proposed orders) with the Bankruptcy Court seeking entry of (i) a Sale Procedures Order in form acceptable to Purchaser and which provides for a breakup fee to Purchaser in the amount of $25,000.00 and other typical procedural requirements for competitive bidding including an initial bid increment of at least $40,000.00 over and above the Purchase Price, and (ii) a Sale Order and any ancillary or related orders in form acceptable to Purchaser and reasonably necessary or advisable to effect the provisions of this Agreement and the Contemplated Transactions.  Seller shall use commercially reasonable efforts to prosecute such motion or motions and to ensure that the Sale Order is entered and approved, and to request that the Sale Order provides that it shall become effective immediately and that the provisions of Federal Rules of Bankruptcy Procedure 6004(g) shall be waived for cause.

4

8.1 <u>Termination Events</u>. By notice given prior to or at the Closing, subject to Section 8.2, this Agreement may be terminated as follows:

(a) – (e) not amended

(f) by Purchaser if the Closing has not occurred on or before sixty (90) days after the signing of this Amendment, or such later date as the parties may agree upon, unless Purchaser is in material breach of this Agreement; or

(g) if the Bankruptcy Court enters an order authorizing and approving an alternative sale or disposition of the Assets to any Person other than Purchaser (an "<u>Alternative Transaction</u>").

8.2 <u>Effect of Termination</u>. In the event of the termination of this Agreement as provided in Section 8.1, this Agreement shall forthwith become void and there shall be no liability or obligation hereunder on the part of Purchaser or Seller; <u>provided, however,</u> if this Agreement is terminated pursuant to Section 8.1(g) and Purchaser is not in default and otherwise ready, willing and able to close the Contemplated Transactions, Seller shall pay Purchaser the Earnest Money and, to the extent applicable in the case of an overbid under the Sale Procedures Order, the Breakup Fee. The Earnest Money refund and the Breakup Fee shall be paid at the closing of an Alternative Transaction or at such date ordered by the Court. The Parties agree and acknowledge that the Earnest Money refund and Breakup Fee shall be allowed and paid as an administrative expense claim of the Purchaser under Section 503(b)(1) of the Bankruptcy Code in consideration of Purchaser's due diligence, good faith negotiations of and entering into this Agreement, and in recognition of Purchaser's work in: (i) establishing a bid standard; (ii) placing Estate property in a position of attracting other potential bidders; and (iii) serving by its expressed interest, as a catalyst for other potential bidders.

9.1 <u>Notices</u>.

If to Seller, to:

> Jason Rae, Chapter 11 Trustee
> Lain, Faulkner & Co., P.C.
> 400 N. Saint Paul, Suite 600
> Dallas, Texas 75201
> jrae@lainfaulkner.com
> (214) 777-0271

With copy to:

> Joe E. Marshall
> Marshall Law
> 3131 McKinney Ave., Suite 600
> Dallas, Texas 75204
> jmarshall@marshalllaw.net
> (214) 579-9173

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed as of the date first above written.

PURCHASER:

North Texas Taco Casa, LLC

By: _____
Name: Sami N. Ebrahim
Title: Managing Partner
Date Signed: ___11 / 1 / 2018___


SELLER:

Divine Dining, LLC,
A Texas Limited Liability Company

By: _____
Name: Jason Rae
Title: Chapter 11 Trustee
Date Signed: ___12 | 5 | 2018___

6